# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Robert J. F.,

Plaintiff,

v.

Kilolo Kijakazi,
Commissioner of Social Security,

Defendant.

Case No. 21-cv-2054 (TNL)

**ORDER**

---

James W. Balmer and Stephanie M. Balmer, Falsani, Balmer, Peterson & Balmer, 1200 Alworth Building, 306 West Superior Street, Duluth, MN 55802 (for Plaintiff); and

Kizuwanda Curtis, James D. Sides, and Tracey Wirmani, Social Security Administration, Office of Program Litigation, 6401 Security Boulevard, Baltimore, MD 21235; and Ana H. Voss, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

# I. INTRODUCTION

Plaintiff Robert J. F. brings the present case, contesting Defendant Commissioner of Social Security's denial of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross motions for summary judgment. ECF Nos. 18, 25. Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 18, is

**DENIED**, and the Commissioner's Motion for Summary Judgment, ECF No. 25, is **GRANTED**.

## II. PROCEDURAL HISTORY

On November 27, 2018, Plaintiff applied for DIB asserting that he has been disabled since April 26, 2018, due to injuries sustained in an explosion at the Superior Refinery in Superior, Wisconsin. Tr. 16, 244-45; *see also* Compl. ¶ 4, ECF No. 1. Plaintiff's application was denied initially on May 29, 2019, and again upon reconsideration on August 1, 2019. Tr. 16, 98-139.

Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ"). Tr. 16, 151-52. The ALJ held a telephone hearing in November 2020, and later issued an unfavorable decision. Tr. 13-35. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied. Tr. 1-7, 241-43.

Plaintiff then filed the instant action, challenging the ALJ's decision. *See generally* Compl. The parties have filed cross motions for summary judgment. ECF Nos. 18, 25. This matter is now fully briefed and ready for a determination on the papers.

## III. MEDICAL RECORDS

### A. 2018

On April 27, 2018, Plaintiff was treated at Essentia Health. Tr. 464. He reported that he works as a carpenter and was involved in an oil refinery explosion at his workplace on April 26, 2018. Tr. 464. He stated that he was thrown to the ground by the explosion and felt pain in his left hand and wrist afterwards. Tr. 464. He initially "did not think

anything too significant" of the pain, but developed increased swelling, bruising, and pain, as well as upper back pain.  Tr. 464.

Grant Bailey, CNP, performed an examination.  Tr. 464-65.  He noted that Plaintiff demonstrated full left wrist range of motion and fine motor skills and intact sensation and circulation, but demonstrated discomfort when touching digit 1 and 5 together.  Tr. 465. Bailey also noted that Plaintiff had tenderness to his left upper back soft tissues.  Tr. 465.

Plaintiff got an x-ray of his left hand, which showed "[n]o evidence of fracture," "[i]ntact articular surfaces," and "[n]ormal joint spaces and alignment."  Tr. 458-59.  He also got an x-ray of his fingers due to left thumb pain.  Tr. 459-60.  Similarly, doctors found normal joint spaces and alignment and no evidence of fracture.  Tr. 60.  An x-ray of Plaintiff's left wrist showed "[m]inor hypertrophic changes radioulnar articulation" and that the joint spaces and alignment were correct. Tr. 461.   X-rays also showed a tiny subcortical cyst within the midpole region of the Plaintiff's scaphoid.  Tr. 462.  Bailey noted that the x-rays "did not reveal any osseous abnormalities." Tr. 465.  He further noted that "[g]iven the objective findings, no further medical interventions are required at this time." Tr. 465.  Plaintiff was directed to return in about two weeks for a follow-up appointment or sooner if symptoms worsen or fail to improve.  Tr. 464-65.

In May, Plaintiff saw Bailey for a follow-up appointment.  Tr. 466.  Plaintiff reported that his left hand remains very tender with intermittent paresthesia and weakness, he has ongoing pain in his left upper back and left neck, and he has increased difficulty hearing from both ears. Tr. 466.  Bailey noted that further tests were needed to determine the cause of Plaintiff's failure to progress and ongoing paresthesias that were not present

3

before the work-related injury.  Tr. 467.  Bailey ordered imaging of Plaintiff's left hand and cervical spine. Tr. 467.  The cervical spine x-ray showed the alignment of Plaintiff's cervical spine was normal, and there was no acute cervical fracture or significant joint space narrowing.  Tr. 468-69.  The x-ray also showed mild degenerative endplate changes.  Tr. 468-69.  Bailey referred Plaintiff to physical therapy for the pain and audiology for his complaints of difficulty hearing.  Tr. 467.

Plaintiff then saw Joseph Cremers, PT, for an initial physical therapy session.  Tr. 470.  Plaintiff reported pain within the neck, left wrist, and forearm, and described increasing pain and generalized soreness with use. Tr. 470.  Cremers evaluated Plaintiff and noted that he has decreased joint mobility, increased myofascial hypertrophy, distal upper extremity weakness, and dural restrictions.  Tr. 472.  Cremers wrote that Plaintiff should attend physical therapy one to two times per week up to four weeks, and interventions will consist primarily of therapeutic exercises, stretching, strengthening, conditioning, and joint mobilizations/manipulations.  Tr. 472.

Plaintiff continued to see Cremers for additional physical therapy sessions.  *See, e.g.,* Tr. 474 (Plaintiff reported reduced left hand paresthesia, noting minimal, infrequent occurrences, but continued neck pain and more directed complaint of pain when pressure is placed on the hand); Tr. 481-82 (Plaintiff reported no significant changes since his last session but admitted "fair to poor compliance" with the home exercise program; Plaintiff complained of neck pain of about 3 or 4 out of 10 on the pain scale and continued left wrist pain; Cremers noted that Plaintiff "[p]resents with full and improved segmental mobility throughout the cervical spine" and "improved dural mobility," but "continues to present

more so with impaired upper thoracic mobility"); Tr. 486 (Plaintiff reported continued wrist and neck pain; Cremers noted that Plaintiff's cervical range reveals left rotation of decreased 60 percent compared to right of 80 percent with noted pain and increased hypertrophy upon palpation; Cremers recommended Plaintiff obtain a referral for bilateral hip pain); Tr. 509-10 (Plaintiff reported ongoing left-sided neck pain, decreased left wrist pain, and continued bilateral hip pain, aggravated primarily with sleep upon lying on his side; Plaintiff reported fair to poor compliance with home exercise program; Cremers instructed Plaintiff to bring in the TENS unit he had at home to go over treatment programming and continue to attend to his neck pain); Tr. 519 (Plaintiff reported lateral hip pain and knee pain); Tr. 521-22 (Cremers noted Plaintiff had improved cervical rotation); Tr. 536 (Plaintiff reported continued chronic pain throughout neck, back, wrist, and bilateral hip); *see also, e.g.*, Tr. 517, 523, 547, 559, 563-64.  At times throughout physical therapy, Plaintiff reported alleviated symptoms.  For example, on September 11, Plaintiff reported that he took prednisone recently, which provides good relief and decreased pain within the hips.  Tr. 545.  And on October 2, Plaintiff reported his bilateral hip pain symptoms have improved.  Tr. 555.  He stated he has only minimal and infrequent occurrences of hip pain and it only happens "a couple of times" generally at the end of the day or at night with sleeping on his sides.  Tr. 555.  At other times, however, Plaintiff reported no significant change in his pain symptoms.  For example, at a physical therapy session in December, Plaintiff reported no significant change in his pain level.  Tr. 617.

Towards the end of May, Plaintiff saw Douglas Hoffman, MD, and reported that he has noticed improvement in his pain with physical therapy and time.  Tr. 476.  Dr. Hoffman

5

conducted a diagnostic ultrasound of Plaintiff's left wrist.  Tr. 476.  Dr. Hoffman wrote that the distal radial ulnar joint, transverse carpal ligament, and thenar motor branch were all normal.  Tr. 479-80.  The ultrasound showed mild enlargement of the median nerve but "no posttraumatic changes to the median nerve or carpal tunnel."  Tr. 476.  Dr. Hoffman was not able to identify other abnormalities.  Tr. 476.  He told Plaintiff that he could perform a diagnostic/therapeutic injection if his symptoms were to persist or worsen, but otherwise made no additional treatment recommendations.  Tr. 476.

In June, Plaintiff saw Bailey for a follow-up appointment.  Tr. 483.  Plaintiff reported that his physical therapy sessions have been going well.  Tr. 483.  He also reported that his cervical neck pain and upper thoracic back pain have only improved minimally since his last visit, and the pain in those regions is aching and is a 3 out of 10 on the pain scale constantly.  Tr. 483.  He also reported that his left wrist pain can be as low as 2 out of 10 and rises to 6 out of 10 with use or by the end of the day.  Tr. 483.  He also reported a 4% hearing loss in the last year.  Tr. 484.  Plaintiff also shared that he was coping well with the events surrounding the explosion, and Bailey noted that Plaintiff was not exhibiting classic signs of depression or anxiety.  Tr. 484.  Bailey recommended that Plaintiff continue physical therapy.  Tr. 484.  He also gave Plaintiff a fixed left wrist brace to provide further comfort.  Tr. 484.  Given the ongoing wrist pain and weakness, Bailey discussed the potential of a left wrist steroid injection, which Plaintiff agreed to do.  Tr. 484-85.

In July, Plaintiff followed up with Bailey.  Tr. 494.  Bailey noted that Plaintiff had a full range of motion in his left wrist and hand, ambulates without difficulty, and walks

with normal gait.  Tr. 495.  He took x-rays of Plaintiff's hip joints due to his complaints of bilateral hip pain.  Tr. 488.  The hip x-rays were "unremarkable" and revealed no evidence of fracture or degenerative changes.  Tr. 489.  Plaintiff also got x-rays of his lumbar spine, which were similarly unremarkable.  Tr. 490-91.  It was noted that Plaintiff's bony alignment was normal, he had no disc space narrowing or significant degenerative spurring, and no factures were evident.  Tr. 491.  The sacroiliac joints x-rays showed no fractures, sclerosis, or ankylosis, but showed minimal joint degenerative changes.  Tr. 492.  Bailey noted that Plaintiff should "continue with conservative measures," including physical therapy.  Tr. 495.  Bailey also prescribed Plaintiff cyclobenzaprine.[1]  Tr. 495.

Plaintiff also saw Carol Herman, OTRL, CHT, in July for occupational therapy.  Tr. 497.  Herman noted that Plaintiff "demonstrates performance deficits of physical function regarding decreased activity tolerance of the use of his wrist and increased pain, decreased strength for gripping and pinching, limiting his ability to tolerate firm gripping-type activities and reducing pain enough that he can sleep comfortably."  Tr. 498.  Plaintiff was given a wrist splint, which "he was very pleased with."  Tr. 497.  The splint was later adjusted to allow Plaintiff to move his thumb better without irritation.  Tr. 500.

At the end of July, Plaintiff saw Janus Butcher, MD, for bilateral hip pain, left wrist pain, neck pain, and back pain.  Tr. 514.  Dr. Butcher noted that shortly after the refinery explosion, Plaintiff had a lot of neck and wrist problems, but "[t]he hip pain really became more of an issue as his other symptoms subsided."  Tr. 514.  Plaintiff described constant

---

[1] Cyclobenzaprine is a medication used in combination with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  *Cyclobenzaprine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682514.html (last accessed Mar. 22, 2023).

pain in both hips that bothers him with weight-bearing activities.  Tr. 514.  He also described low back pain and neck pain.  Tr. 514.  Dr. Butcher noted that Plaintiff had very limited mobility in the lumbar spine but had a full range of motion in the hips.  Tr. 515.  She ordered an ultrasound of Plaintiff's hips and instructed him to continue with physical therapy.  Tr. 515.

In August, Plaintiff had a follow-up appointment with Bailey and reported that he has ongoing pain in his left hand, hips, neck, and back.  Tr. 525.  He stated that the custom wrist brace provided some relief, but greatly limits the use of his left hand.  Tr. 525.  He reported left hand pain at a 6 out of 10.  Tr. 525.  He explained that his hip pain is worsening and that he cannot lie on his sides anymore because the pain becomes unbearable.  Tr. 526.  Plaintiff denied taking over-the-counter medications because "he does not want to mask the pain and risk further injury."  Tr. 526.  He further reported that he wears hearing aids and "no longer has difficulty hearing."  Tr. 526.  Given Plaintiff's ongoing and unresolving symptoms, Bailey recommended that Plaintiff see occupational medical specialist Stefan Kaiser, MD.  Tr. 526.

Plaintiff then saw Dr. Kaiser and reported stiffness and soreness in his left neck.  Tr. 540-41.  He denied any radiating pains into the upper extremities and stated that his discomfort in his left wrist has decreased, but he gets sore after about 20 minutes of walking.  Tr. 541.  Dr. Kaiser noted that Plaintiff demonstrates good range of motion of his neck and fairly good mobility of his hand, fingers, and back.  Tr. 541.  Dr. Kaiser noted that Plaintiff has some mild tenderness over the gluteal tendon region bilaterally, but otherwise demonstrated good range of motion of the hips  Tr. 541.

Also in August, Plaintiff saw Heather Grothe, MD, for a bilateral hip ultrasound. Tr. 528. Dr. Grothe noted that the left hip findings were unremarkable, but the images of Plaintiff's right hip demonstrate tendinopathy of the gluteus minimum tendon with scattered intrasubstance calcifications. Tr. 528. Plaintiff later reviewed the results of the ultrasound with Dr. Butcher. Tr. 538. At that appointment, he reported significant difficulty with his neck, back, and hips, but that his wrist was "okay." Tr. 538. Dr. Butcher noted that the ultrasound showed no evidence of disruption of the gluteus medius and that no tearing was detected. Tr. 538, 541. Dr. Butcher recommended that Plaintiff try empiric treatment with Medrol Dosepak.[2] Tr. 539.

In early September, Plaintiff saw Dr. Butcher for his bilateral hip pain. Tr. 543. Dr. Butcher noted that Plaintiff did the Medrol Dosepak and it "went very well for him" in that he "had almost complete resolution of his symptoms." Tr. 543. Plaintiff reported that he has been able to ambulate better and get out and participate in some general exercise. Tr. 543. Plaintiff reported, however, that he is still having issues with his wrists. Tr. 543. Dr. Butcher recommended that Plaintiff continue with physical therapy, increase his overall exercise activities, and return to see her on an as-needed basis. Tr. 543.

Plaintiff also saw Samuel Hoxie, MD, in September for his wrist pain. Tr. 549. He reported that he is wearing a brace to alleviate his wrist pain, but the pain has worsened throughout the last 2-3 weeks. Tr. 549. Plaintiff stated he believes the brace may worsen his pain to some degree. Tr. 549. He reported that his wrist was never casted and that he

---

[2] Medrol is a brand name for methylprednisolone, a medication used to relieve inflammation and pain. *Methylprednisolone*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682795.html (last accessed Mar. 22, 2023).

has taken prednisone in the past, but it did not improve his pain.  Tr. 549.  Dr. Hoxie examined Plaintiff's wrist, noted that it has not improved with conservative care, and recommended casting Plaintiff's arm.  Tr. 551.  A surgical assistant then applied a short arm cast to Plaintiff's left arm and wrist.  Tr. 551-52.

Also in September, Plaintiff saw Dr. Kaiser for a follow-up evaluation.  Tr. 552.  He reported that he completed physical therapy, but his symptoms linger, and he is continuing to experience left-sided neck pain.  Tr. 552.  He is no longer experiencing the peripheral paresthesias in his left hand but does have localized pain of his wrist.  Tr. 552.  He complained of recurrent soreness and stiffness of his bilateral gluteal tendon, as well as anxiety and insomnia, a short temper, and irritability.  Tr. 552-53.  Dr. Kaiser examined Plaintiff and noted that his neck shows localized tenderness, but he demonstrates full active range of motion of his neck.  Tr. 553.  Dr. Kaiser wrote that Plaintiff has full flexion and range of motion of the hips with tightness of his hip flexors and hamstrings but can ambulate with a normal gait pattern without any instability.  Tr. 553.  Due to the ongoing neck pain despite physical therapy, Dr. Kaiser recommended Plaintiff get a cervical spine MRI.  Tr. 553.  He also recommended that Plaintiff proceed with physical therapy for stretching exercises, therapeutic modalities for symptomatic relief, and core strengthening exercises.  Tr. 553.  He also recommended Plaintiff get a psychological evaluation due to his reports of anxiety.  Tr. 553.

Plaintiff saw Dr. Hoxie again in October.  Tr. 557.  Plaintiff reported slight improvement in pain with wearing the cast, but he experiences shooting pain with wrist

flexion and extension.  Tr. 557.  Dr. Hoxie recommended that Plaintiff continue to use the cast and participate in physical therapy to increase range of motion.  Tr. 558.

Plaintiff also got a cervical spine MRI in October.  Tr. 560.  Dr. Kaiser noted that the alignment of Plaintiff's cervical spine and vertebral body heights are normal, and the craniocervical junction is unremarkable. Tr. 561.  He noted no significant focal marrow edema or focal suspicious marrow.  Tr. 561.  He found a tiny area of T2 signal hyperintensity extending from C4 through C7 in the central cord.  Tr. 561.  Dr. Kaiser also noted that the MRI showed degenerative changes in the mid to lower cervical spine with slight flattening of the left C5-C6 anterior cord, and moderate left C4-C5 neural foraminal narrowing.  Tr. 561.  Later that month, Plaintiff reported to Dr. Kaiser that he was experiencing problems related to memory and cognition.  Tr. 566.  Dr. Kaiser recommended that Plaintiff consult with neurology.  Tr. 566.  Dr. Kaiser also recommended that Plaintiff continue taking tizanidine,[3] which Plaintiff reported has been helpful for him. Tr. 566.

In November, Plaintiff saw Dr. Hoxie for a follow-up appointment for his left wrist pain.  Tr. 568.  Plaintiff reported ongoing significant shooting pain and stiffness.  Tr. 568. Dr. Hoxie recommended Plaintiff wear a brace for "activities and sleeping" and referred Plaintiff for proprioception recovery.  Tr. 569.

The next day, Plaintiff met with psychologist Gerry Ouellette, MS, LP, for a psychological rehabilitation evaluation.  Tr. 570.  Ouellette noted that Plaintiff "express[es]

---

[3] Tizanidine is a skeletal muscle relaxant medication that works to slow action in the brain and nervous system to allow the muscles to relax.  *Tizanidine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/ a601121 html (last accessed Mar. 22, 2023).

frustration and some mild depression is evident." Tr. 571. Plaintiff also reported a history of anxiety. Tr. 571. Ouellette recommended Plaintiff continue seeing him for therapy on a weekly basis for about four or five months. Tr. 572. Plaintiff had several additional appointments with Ouellette. *See, e.g.*, Tr. 589-90, 601-02, 618.

Later in November, Plaintiff also began occupational therapy for his left wrist pain. Tr. 574. The occupational therapist noted that Plaintiff demonstrates impairment in his ability to use his left hand for work and home tasks and would benefit from upper extremity therapy to address his deficits. Tr. 575. Plaintiff later participated in several additional occupational therapy sessions. *See, e.g.,* Tr. 577-82, 591-92, 603-05.

Also in November, Plaintiff saw Beth Staab, MD, at Noran Neurological Clinic. Tr. 736; *see also* Tr. 400. Plaintiff reported increased frequency and duration of his headaches. Tr. 736. He also reported increased depression and anxiety. Tr. 736. Dr. Staab noted that based on Plaintiff's work-related injury, she suspects he likely has a mild traumatic brain injury and could be developing posttraumatic stress disorder. Tr. 738. Dr. Staab recommended that Plaintiff take Topamax[4] to reduce his headaches, get a brain and thoracic spine MRI, get a cervical epidural steroid injection, and continue physical therapy. Tr. 738-39. The thoracic spine MRI showed normal alignment, no fractures, no spondylosis, normal cord signal, no evidence of syrinx within the thoracic cord, no spinal canal or neural foraminal narrowing at all levels of the thoracic spine, and mild thoracic spondylosis. Tr. 731. The brain MRI showed no acute intracranial abnormalities and

---

[4] Topamax is a brand name for topiramate, a medication used to prevent migraine headaches. *Topiramate*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a697012 html (last accessed Mar. 22, 2023).

normal brain parenchymal morphology.  Tr. 732.  Plaintiff also received a cervical epidural steroid injection and tolerated the procedure well.  Tr. 593-95.

In December, Plaintiff saw Dr. Hoxie and reported constant wrist pain that causes sleep difficulties.  Tr. 583.  He reported that occupational therapy was not improving his symptoms.  Tr. 583.  Dr. Hoxie recommended Plaintiff get an MRI of his left wrist to further evaluate his symptoms, which showed a partial-thickness tear of the dorsal scapholunate ligament.  Tr. 584-86; *see also* Tr. 611-15.  The MRI showed some increased ill-defined signal intensity at the periphery of the triangular fibrocartilage.  Tr. 585-86.  The MRI also showed that Plaintiff had no marrow edema, fractures, erosions, masses, fluid collections, or joint effusions.  Tr. 585-86.

**B.  2019**

In January 2019, Plaintiff returned to Dr. Staab at the Noran Neurological Clinic. Tr. 397, 727; *see also* Tr. 620.  Dr. Staab noted that despite being prescribed Topamax at the last visit, Plaintiff did not start it due to concerns about its side effects.  Tr. 727.  Plaintiff reported ongoing headaches, difficultly concentrating, memory loss, neck pain, depression, anxiety, daytime sleepiness, difficulty falling asleep, and an aching sensation in his legs, among other symptoms.  Tr. 727.  Dr. Staab again recommended Plaintiff begin taking Topamax for his headaches and continue physical therapy.  Tr. 729.

In February, Plaintiff saw Dr. Kaiser for a follow-up appointment.  Tr. 639.  Plaintiff reported taking Effexor[5] and feeling anxiety and a short temper.  Tr. 639.  Dr. Kaiser noted

---

[5] Effexor is a brand name for venlafaxine, a medication used to treat depression.  *Venlafaxine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694020.html (last accessed Mar. 22, 2023).

that Plaintiff appeared agitated or anxious.  Tr. 639-40.  He also noted that Plaintiff "is noticing marked reduced pain in his left wrist."  Tr. 640.

Plaintiff saw Dr. Hoxie the following week.  Tr. 641.  Plaintiff reported "that he is doing well generally, though he still experiences pain related to activity," such as when scraping in the garage or holding his daughter for too long.  Tr. 641.  Plaintiff reported an improvement of his symptoms since fall 2018.  Tr. 641.  Dr. Hoxie noted that Plaintiff can expect his pain to slowly resolve over time.  Tr. 642.

In March, Plaintiff saw Dr. Kaiser for "constant and unchanged pain right at the base of his skull and the central suboccipital region."  Tr. 654-55.  He reported significant increased pain with manual work.  Tr. 655.  He reported using Tylenol and ibuprofen to maximal dosages. Tr. 655.

Plaintiff then had a headache/craniosacral consultation.  Tr. 658.  The physical therapist noted that no further craniosacral treatment was needed as Plaintiff's pain does not appear to be related to cranial restrictions.  Tr. 658.  The physical therapist also noted that breathing exercises may help Plaintiff decrease neck and upper back tension and that Plaintiff could benefit from a generalized strengthening/conditioning routine to help control his chronic pain and limited activity.  Tr. 659.

At the end of March, Plaintiff saw Gary Beaver, DO, for a neurology consultation. Tr. 677-79.  Dr. Beaver noted that Plaintiff has cervicogenic headaches, cervicalgia, and a sleep disorder.  Tr. 679.  He recommended Plaintiff decrease, and eventually stop taking,

Topamax and start taking amitriptyline[6] at bedtime for headache relief.  Tr. 679.  Dr. Beaver wrote that he suspects some of the cognitive issues Plaintiff is noticing is due to his fragmented sleep patterns.  Tr. 679.

Plaintiff also saw Timothy Morton, MD, for a consultation for his neck pain and concussion.  Tr. 681.  Dr. Morton recommended Plaintiff receive another cervical facet injection to improve his sleep and headache-related symptoms.  Tr. 683.

In early April, Plaintiff saw Dr. Kaiser and reported that he has noticed some improvement in his headaches from the recent medication change.  Tr. 684-85.  Dr. Kaiser noted that Plaintiff plans to get additional lower cervical spine facet joint injections to help neck pain which contributes to his headaches.  Tr. 685.

In May, Plaintiff received cervical facet injections.  Tr 688-99.  According to his doctors, he tolerated the procedure well.  Tr. 689.  A few weeks later, Plaintiff reported some mild relief following the injections.  Tr. 698.  He also reported that his symptoms have been "much better" since taking amitriptyline and he believes it helps reduce his irritability, though it causes drowsiness.  Tr. 698.  Dr. Kaiser noted that he suspects Plaintiff is dealing with significant depression and advised Plaintiff to follow up with his psychologist.  Tr. 699.

In June, saw Dr. Kaiser for a follow-up visit.  Tr. 923.  He reported that his neck pain is gradually worsening, and he continues to have stiffness in his hips that comes and goes.  Tr. 923.  Plaintiff also reported decreased energy and increased fatigue, tiredness,

---

[6] Amitriptyline is a medication used generally to treat depression but can also be used to prevent migraine headaches.  *Amitriptyline*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682388 html (last accessed Mar. 22, 2023).

and stress.  Tr. 923-24.  Dr. Kaiser noted that Plaintiff's neck range of motion is fairly normal with some stiffness on lateral bending, and his range of motion in his back is fairly normal as well.  Tr. 924.  Dr. Kaiser again recommended that Plaintiff see a psychologist regarding his depressive symptoms.  Tr. 925.

In July, Plaintiff had a follow-up neurology appointment.  Tr. 918.  He reported that he has been taking amitriptyline and feels it helps his anxiety and ability to sleep.  Tr. 918. He reported that he still feels pain in the back of his head and along his neck muscles.  Tr. 918.

Plaintiff also continued physical therapy with Cremers in 2019.  *See, e.g.,* Tr. 622-25, 628-29, 632-33, 645-48, 650-51, 657.  As he did in 2018, Plaintiff reported alleviated pain at some appointments and increased pain at others.  *See, e.g.,* Tr. 632 (reporting decreased daily pain); Tr. 645, 650-51 (reporting ongoing symptoms of chronic neck pain and headache-based pain).  Plaintiff also continued psychological therapy with Ouellette in 2019. *See, e.g.,* Tr. 626-27, 630-31, 637-38, 643-44, 649, 652-53, 660-61, 675-76, 686-87.

### C. 2020

In March 2020, Plaintiff got updated x-rays after reporting continued neck pain, back pain, and headaches.  Tr. 791.  The x-rays of Plaintiff's sacroiliac joints appeared normal.  Tr. 779-81.  The x-rays of his lumbar spine showed slight progression of mild to moderate disc degeneration and facet degenerate changes.  Tr. 782-84.  Doctors directed Plaintiff to get MRIs to assist with further evaluation.  Tr. 784.

Later in March, Plaintiff had a cervical spine MRI.  Tr. 763; *see also* Tr. 777-78. The MRI showed progressive disc protrusions, facet degenerative changes and uncovertebral hypertrophy, and small syrinx posterior.  Tr. 765.  Specifically, it showed progressive changes at C4-C5, C5-C6, and C6-C7.  Tr. 764-65.  Plaintiff also had a lumbar spine MRI, which showed multilevel mild-to-moderate facet degenerative changes and small posterior disc bulge/protrusion.  Tr. 767-68.  Plaintiff was referred to neurosurgery for further evaluation and management.  Tr. 769.

In April, Plaintiff spoke with Okechukwu Iwu, MBBS, via telephone for a follow-up appointment.  Tr. 988.  Plaintiff reported ongoing lower back pain, neck pain, and headaches.  Tr. 988.  He was referred to neurosurgery at a spine center and advised to continue using acetaminophen for the pain.  Tr. 991.  He was also advised to continue taking Effexor for depression.  Tr. 991.

Plaintiff also saw Melissa Rose, APRN, CNP, in April for a neurosurgery consultation to evaluate his chronic daily headaches and neck and lower back pain.  Tr. 973.  Rose did not complete a physical examination as the appointment was conducted via telephone.  Tr. 978.  Rose recommended "ongoing conservative therapy for management of symptoms."  Tr. 979.  She referred Plaintiff to physical therapy and recommended additional injections.  Tr. 979.

Plaintiff then began seeing physical therapists Brenda Leavelle and Nancy Walsh, and continued physical therapy through mid-2020.  *See, e.g.,* Tr. 950, 953, 958, 961, 964, 967, 969, 1037-38, 1040, 1042, 1044, 1051, 1053, 1055, 1057, 1059, 1061.  In general, Plaintiff reported improvement in his symptoms with physical therapy, especially in the

17

last several sessions. *See, e.g.,* Tr. 1051 (reporting it is "[g]etting easier to move around at home and do more things," and "[b]ending is getting easier"); Tr. 1044 (reporting improvement in back pain and overall mobility); Tr. 1042 (reporting lower back pain "is better than it was," and that he "can bend much easier to pick up things and take care of the kids"); Tr. 1040 (reporting improvement in mobility and even more improvement in his back pain). At a few of his physical therapy appointments, Plaintiff noted that he walks regularly around the house and takes his children outside walking, and that he gets about 5,000 steps a day. *See, e.g.,* Tr. 961, 1059.

In June, Plaintiff saw Iwu for a follow-up appointment for his low back pain, anxiety, and depression. Tr. 1046. Plaintiff reported that physical therapy has helped with his movement and his back pain. Tr. 1046. Plaintiff also stated that his range of motion is improving, and he has less pain. Tr. 1046. He reported that using orthotics in his shoes has helped with pain in his feet, though he has a bit of pain radiating to his legs. Tr. 1046. He also reported that his mood has been "up and down," and has had "[a] bit of both anxiety and depression." Tr. 1046. Iwu recommended Plaintiff proceed with additional facet joint injections to the lumbar spine and continue physical therapy. Tr. 1049.

On November 16, 2020, four days before Plaintiff's hearing with the ALJ, Plaintiff saw Timothy Garvey, MD, via telehealth at the Twin Cities Spine Center. Tr. 1066. Plaintiff complained of low back pain and neck pain with radiation to the left upper extremity. Tr. 1066. He reported numbness and tingling, more so on the left side than right side. Tr. 1066. He also reported that physical therapy, injections, anti-inflammatory medications, and treatment in a pain clinic have not resulted in long-term improvement of

his symptoms, and that he is considering surgical intervention.  Tr. 1066.  Dr. Garvey did

not complete a physical evaluation or examination of Plaintiff but did review his March

2020 MRI.  Tr. 1067.  Dr. Garvey noted that the MRI shows that Plaintiff "has lumbar and

cervical sprain/strain. He, in fact, anatomically has disc herniations at C5-6 and C6-7, with

foraminal narrowing at C4-5, that could fit with his neck and left periscapular and upper

extremity pain."  Tr. 1067.  Dr. Garvey noted that he would need to see Plaintiff in person

for a physical evaluation to give a definitive opinion regarding potential options.  Tr. 1067.

### D. Post-Hearing Medical Records

On December 7, 2020, Plaintiff had an in-person appointment with Dr. Garvey at

the Twin Cities Spine Center.  Tr. 368-69; *see also* Tr. 71-74, 359-67.  Dr. Garvey reviewed

Plaintiff's MRI from March, conducted a physical examination, and took additional images

of Plaintiff's cervical spine.  Tr. 368-69.  Dr. Garvey concluded that Plaintiff has disc

herniations at C5-6 and C6-7 with neurological compression.  Tr. 369.  Dr. Garvey

recommended Plaintiff receive surgery for a two-level anterior cervical decompression and

fusion.  Tr. 366.  Plaintiff was then scheduled for surgery on his cervical spine on March

11, 2021.  Tr. 69; *see also* Tr. 359, 364.

### IV. OPINION EVIDENCE

### A. Reports of Work Ability

Several providers completed reports of work ability for Plaintiff.  On April 27, 2018,

Grant Bailey, APRN, CNP, opined that Plaintiff could return to work without restrictions.

Tr. 926.

On May 8, 2018, Bailey opined that Plaintiff could return to work, but could not lift or carry items with his left hand greater than five pounds through June 5, 2018.  Tr. 927.

On June 5, 2018, Bailey opined that Plaintiff could work, but could not lift or carry items with his left wrist greater than 10 pounds through July 9, 2018.  Tr. 928.  On July 9, 2018, Bailey made the same opinions through August 6, 2018.  Tr. 929.

On July 30, 2018, Janus Butcher, MD, opined that Plaintiff could not return to work.  Tr. 930.

On August 16, 2018, Bailey opined that Plaintiff could work, but could not lift or carry items with his left hand greater than 10 pounds.  Tr. 931.  He also limited Plaintiff to sedentary duties, sitting 90% of the time.  Tr. 931.

On August 31, 2018, Stefan Kaiser, MD, opined that Plaintiff could work with light duties.  Tr. 932.  This included continuing to splint the left wrist, avoiding lifting/carrying greater than 10 pounds with left hand, avoiding forceful grasping greater than 20 pounds with left hand, and allowing frequent positional changes.  Tr. 932.  On September 6, 2018, Dr. Butcher made the same opinion as Dr. Kaiser did on August 31.  Tr. 933.

On September 21, 2018, Samuel Hoxie, MD, opined that Plaintiff could return to work but would temporarily be unable to use his left arm.  Tr. 934.

On September 26, 2018, Dr. Kaiser opined that Plaintiff could return to work with light duties, including continuing to splint the left wrist, avoiding lifting/carrying greater than 10 pounds with left hand, avoiding forceful grasping greater than 20 pounds with left hand, and allowing frequent positional changes.  Tr. 935.  Dr. Kaiser and Dr. Hoxie filled out several additional reports of work ability and made the same opinions that Dr. Kaiser

did on September 26, 2018. *See* Tr. 936 (October 9, 2018), 937 (October 31, 2018), 938 (December 4, 2018), 939, 941 (December 5, 2018), 940 (December 19, 2018), 942 (February 6, 2019), 943 (March 6, 2019), 944 (April 5, 2019), 945 (May 17, 2019), 946 (June 28, 2019).

### B. Dr. Joseph Burgarino

In October 2018, Joseph Burgarino, MD, conducted a comprehensive independent medical neurologic and neuropsychiatric examination of Plaintiff. Tr. 706-14. Dr. Burgarino conducted several examinations, including neurological, neurovascular, motor, cerebellar, clinical neurology, and mental status examinations, which all appeared generally normal. Tr. 710-11. He noted that there is no compelling evidence to support the sustenance of any closed head traumatic brain concussive injury related to the work injury from April 26, 2018. Tr. 707. Similarly, he concluded that there is no compelling medical evidence to show that the Plaintiff's bilateral hip pain, which he started experiencing one month after the work incident, is related to that incident. Tr. 707. Dr. Burgarino opined that maximum medical improvement/healing is likely to occur within three months of the date of his examination, or approximately by the end of January 2019. Tr. 707. Dr. Burgarino recommended light-duty work restrictions. Tr. 708.

### C. Dr. Stephen Barron

At the end of November 2018, Stephen Barron, MD, performed an independent medical examination of Plaintiff. Tr. 715-23. He noted that Plaintiff can extend his neck 45 degrees, flex and touch his toes, has 45 degrees of abduction bilaterally in his hips, has no swelling to his wrists, has 75 degrees of dorsiflexion and palmar flexion, and has

diminished grip strength on the left.  Tr. 720.  He opined that Plaintiff did not injure his hips in the work-related incident in April 2018 but did injure his wrist and sustain a tear of the dorsal scapholunate ligament.  Tr. 721.  He opined that Plaintiff needed no further treatment or testing due to the lack of objective findings and normal orthopedic examination of Plaintiff's cervical spine and left wrist.  Tr. 721.  He opined that no work restrictions were necessary.  Tr. 722.

### D.  Dr. Mark Gregerson

In March 2019, Plaintiff was evaluated by Mark Gregerson, MD.  Tr. 752.  Dr. Gregerson opined that Plaintiff has degenerative change with disc herniation and post-traumatic syrinx of the cervical spine, posttraumatic stress syndrome, traumatic brain injury, scapholunate ligament tear in the left wrist, and a hip strain.  Tr. 754.  He opined that no further treatment for Plaintiff's hips or cervical spine is necessary, but he should work with his neurologists for his headaches and traumatic brain injury.  Tr. 754.  He opined Plaintiff would not be able to return to his normal work activities due to his injuries.  Tr. 754.

### E.  Dr. Marlin Trulsen

In May 2019, Plaintiff underwent a consultative evaluation with Marlin Trulsen, Ph.D., LP, at the request of the Social Security Administration.  Tr. 662.  Dr. Trulsen diagnosed Plaintiff with a mild neurocognitive disorder, due to a history of traumatic brain injury, without behavioral disturbance.  Tr. 667.  He opined that Plaintiff's general mental capacity for understanding appears adequate and Plaintiff shows no general impairment.  Tr. 667.  Dr. Trulsen opined that Plaintiff's general mental capacity for remembering,

following instructions, sustaining attention, concentrating, and carrying out work-like tasks with reasonable persistence or pace is slightly impaired. Tr. 667. Further, he opined that Plaintiff's general mental capacity for responding appropriately to brief and superficial contact with coworkers and supervisors and tolerating stress and pressures typically found in an entry-level workplace is a slight to occasionally moderate level of impairment. Tr. 667-68. He noted that Plaintiff is capable of respecting authority, has no difficulties sitting, standing, or walking, and has an average ability to hear and produce normal conversation. Tr. 668.

### F. State Agency Consultants

In April and August 2019, two state agency medical consultants assessed Plaintiff's physical residual functional capacity. Tr. 108-11, 128-31. They opined that Plaintiff had exertional limitations. Tr. 109, 129. Specifically, Plaintiff was limited to occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds. Tr. 109, 129. Additionally, Plaintiff could stand and/or walk for about 6 hours and sit for about 6 hours in an 8-hour workday. Tr. 109, 129. They also opined that Plaintiff had postural limitations, including occasionally climbing ramps/stairs and ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching, and crawling. Tr. 109, 129. They opined that Plaintiff had manipulative limitations, namely, that he was limited in handling (gross manipulation) and fingering (fine manipulation) with his left hand. Tr. 109-10, 129-30. They restricted Plaintiff to handling and fingering with his left hand only frequently. Tr. 110, 130. The state agency medical consultants also concluded that Plaintiff has environmental limitations and should avoid concentrated exposure to noise and hazards

(machinery, heights, etc.).  Tr. 110, 130-31.  The state agency medical consultants also opined that Plaintiff had no visual or communicative limitations.  Tr. 110, 130.

Two state agency psychological consultants also assessed Plaintiff's mental residual functional capacity in May and August 2019.  Tr. 111-14, 131-35.  They opined that Plaintiff had understanding and memory limitations in that Plaintiff was moderately limited in his ability to remember locations and work-like procedures and understand and remember detailed instructions.  Tr. 111, 132.  They concluded that he was not significantly limited in understanding and remembering very short and simple instructions.  Tr. 111, 132.  They opined that Plaintiff had sustained concentration and persistence limitations.  Tr. 111, 132.  Specifically, the state agency psychological consultants opined that Plaintiff is moderately limited in his ability to make simple work-related decisions and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 112, 132.  They opined that Plaintiff's social interaction limitations included being moderately limited in his ability to interact appropriately with the general public, ask simple questions or request assistance, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 112, 132-33.  They opined that Plaintiff also had adaption limitations, including that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others.  Tr. 112-13, 133.  But Plaintiff was not otherwise significantly limited.  Tr. 112-13, 133.

### G. Lynne Lamar, MA, LP

On October 8, 2020, Lynne Lamar, MA, LP, completed a mental medical source statement.  Tr. 996-1001.  She noted that she had seen Plaintiff from July 2, 2020, to October 6, 2020, and that Plaintiff has been diagnosed with posttraumatic stress disorder, acute stress reaction, moderate episode of major depressive disorder, mild traumatic brain injury/cognitive disorder, and post-concussion syndrome.  Tr. 996.  She wrote that Plaintiff is receiving cognitive behavior therapy and mind/body interventions to broaden coping skills, manage mood and cognitive changes, and monitor suicide ideation.  Tr. 997.

Lamar opined that Plaintiff had limitations in understanding, remembering, or applying information. Tr. 998.  Specifically, she opined that Plaintiff had an extreme limitation in asking and answering questions and providing explanations; marked limitation in understanding and learning terms, instructions, and/or procedures and using reason and judgment to make work-related decisions; moderate limitation in describing work activity to someone else, recognizing a mistake and correcting it, and sequencing multi-step activities; and mild limitation in following one- or two-step oral instructions to carry out a task and identifying and solving problems.  Tr. 998.  She opined that Plaintiff also had limitations in cooperating with others: an extreme limitation in handling conflicts with others and stating own point of view; moderate limitation in initiating or sustaining conversation and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; and mild limitation in cooperating with others, asking for help when needed, understanding and responding to social cues, and responding to requests, suggestions, criticism, correction, and challenges.  Tr. 998.  As far as

25

concentrating, persisting, or maintaining pace, Lamar opined that Plaintiff had an extreme limitation in ignoring or avoiding distractions while working, sustaining an ordinary routine and regular attendance at work, and working a full day without needing more than the allotted number or length of rest periods; a marked limitation in completing tasks in a timely manner; a moderate limitation in working at an appropriate and consistent pace; a mild limitation in working close to or with others without interrupting or distracting them; and no limitation in initiating and performing a task that is understood and changing activities or work settings without being disruptive.  Tr. 998.  Finally, Lamar opined that Plaintiff had the following limitations in adapting or managing himself: an extreme limitation in adapting to changes; marked limitation in responding to demands and managing psychologically based symptoms; mild limitation in setting realistic goals and making plans for self independently of others; and no limitation in maintaining personal hygiene and attire appropriate to a work setting.  Tr. 999.  She further opined that Plaintiff would be late or absent from work more than four days per month and would be off task 25% or more of the time.  Tr. 1000.

### H. Okechukwu Iwu, MBBS

On November 6, 2020, Okechukwu Iwu, MBBS, wrote that Plaintiff's medical issues significantly impact his abilities to: be reliable and dependable; be productive through an 8-hour day; remember and follow simple, routine instructions; concentrate and stay focused on tasks for two-hour segments on even simple routine tasks; and get along with coworkers and supervisors; as well as increase the need for unscheduled breaks during

the day.  Tr. 1064.  He added that these problems are of a long-term nature, and he does not expect significant improvements during at least the next year.  Tr. 1065.

## V. HEARING TESTIMONY

At the hearing in November 2020, Plaintiff testified that he is a high school graduate and is not currently working.  Tr. 43.  He worked previously in construction for 27 years. Tr. 43.

Plaintiff testified that while working construction on April 26, 2018, there was an explosion at his worksite that resulted in him being injured.  Tr. 46.  He testified that he now has cognitive difficulties and has a hard time finding words to match what he is trying to say or feel.  Tr. 46, 49.  Ever since the incident, he has difficulty remembering things and concentrating, and makes mistakes.  Tr. 53-54.  When he goes grocery shopping, for example, he has to bring a list, or he will forget what he went to the store for.  Tr. 54.  He also testified that his anxiety has increased.  Tr. 46, 49.  He testified that his family life has been challenging because he has angry outbursts, though his outbursts are getting better. Tr. 50.  He testified that he gets anxiety when he tries to talk to people.  Tr. 50.  He also has difficulties sleeping and is "tired [and] sluggish" during the day.  Tr. 59.

As far as physical injuries, Plaintiff testified that he has had neck, lower back, hip, and leg problems since the incident.  Tr. 46-47   He testified that he experiences daily headaches with constant pain/pressure at the base of his skull, which last all day and do not stop.  Tr. 48.  He testified that he "ha[s not] had one day, since the accident, without any pain in the base of [his] skull, or in [his] neck."  Tr. 46.  He testified that he has not found relief with pain medications or any other treatment.  Tr. 46, 48.  He tried Topamax for his

headaches, but it gave him nightmares and he did not have good experiences with it.  Tr. 48.  He testified that he also had wrist problems, but "[i]t seems to be okay."  Tr. 47.  He testified that he does not use his wrist as much as he used to when working, but he would likely have difficulty lifting heavier things weighing about 25 or 30 pounds.  Tr. 55-56.  He said that when his youngest child was smaller and he would have to carry her regularly, his wrist would start to ache and hurt.  Tr. 56-57.  Plaintiff also testified that he sometimes experiences tingling and numbness in his hands.  Tr. 47.  He also testified that he has hearing problems on both sides.  Tr. 47.  He received hearing aids seven years ago but has had more difficulty hearing since the April 2018 incident.  Tr. 47.  He also testified that he also has vision problems, including blurriness when trying to read or otherwise focus.  Tr. 47.  Further, Plaintiff stated that he has spine problems.  Tr. 48-49.  He testified that he recently spoke with a surgeon at the Twin Cities Spinal Center who reviewed his MRIs and concluded that he has bulging discs that may be touching his spinal cord and nerves.  Tr. 49, 65-66.  Plaintiff testified that he plans to see the surgeon in person for a physical examination.[7]  Tr. 49, 65.

With respect to daily activities, Plaintiff testified that he drives regularly and brings his daughter to school four days per week.  Tr. 43.  While his wife is away at work Monday through Friday, Plaintiff gets up with his children, makes them breakfast, watches television with them, helps his son with his schooling, and does some chores around the house.  Tr. 51-53.  He testified that he regularly prepares meals for his family, cleans, and

---

[7] At the conclusion of the hearing, the ALJ gave Plaintiff two weeks to submit any additional documentation from the Twin Cities Spinal Center.  Tr. 66-67.

does laundry.  Tr. 51-52.  He attends medical appointments, goes grocery shopping and to stores, goes on walks, and sees family outside the home every now and then.  Tr. 50-51. He testified that he has always enjoyed fishing and hunting but is more limited in what he can do now.  Tr. 51.  He can walk for about half an hour at a time before his legs and feet start aching.  Tr. 54-55.  He also enjoys reading but has to hold whatever he is reading in front of him because he will start having pain in his neck if he has his head down for too long.  Tr. 57.  He testified that he does not have friends anymore because "having a conversation with [him], the last couple years, wasn't really enjoyable" because he is "not who [he] used to be."  Tr. 58.

He testified that he could not work a full-time job because he would have difficulty "[n]ot being able to sit and rest, if [he] need[s] to take a nap, sleep, just concentrat[ing], dealing with people, and trying to be professional, answering questions."  Tr. 55.  He testified that he gets "very jumbled" when trying to multitask and gets easily frustrated. Tr. 55.

Vocational expert Jacqueline Bethell also testified at the hearing.  Tr. 59-63.  She testified that Plaintiff's previous work experience as a carpenter involves "very heavy" work and is classified as a skilled job.  Tr. 59-60.  Bethell testified that a hypothetical individual with Plaintiff's age, education, experience, and limitations could not perform Plaintiff's past work.  Tr. 60.  She testified that based upon her education, training, and professional experience, the hypothetical individual could, however, perform other "light" jobs, such as housekeeping cleaner, marker, and mail clerk.  Tr. 61, 63.  The hypothetical individual could perform those jobs even with a limitation of no forceful grasping or

torquing with the left hand. Tr. 61. However, if a limitation was added that the hypothetical individual would be able to change position at will from sitting to standing and standing to sitting, the jobs could not be performed. Tr. 61-62. Bethell testified that if a limitation was added that the hypothetical individual could sit for one to two minutes after 30 minutes of standing or walking, the individual could not do the marker job, but could do the housekeeping cleaner and mail clerk jobs. Tr. 62. Bethell testified that there is no tolerance for unscheduled breaks in these positions, but there is a tolerance for being off task for ten percent of the workday. Tr. 62-63.

## VI. ALJ'S AND APPEALS COUNCIL'S DECISIONS

The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; a scapholunate ligament tear of the left wrist; bilateral hearing loss; migraine headaches; a traumatic brain injury; post-concussion syndrome; obstructive sleep apnea; major depressive disorder; and post-traumatic stress disorder. Tr. 19. The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1. Tr. 19-21.

The ALJ further found that Plaintiff had the residual functional capacity to perform light work[8] with additional limitations as follows:

---

[8] As set forth in the regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially

> [F]requent reaching overhead bilaterally; frequent handling
> and fingering with the left upper extremity; able to climb ramps
> and stairs occasionally, never climb ladders, ropes, or
> scaffolds, occasionally balance on narrow, slippery or
> erratically moving surfaces, stoop occasionally, kneel
> occasionally, crouch occasionally, crawl occasionally;
> occasional visual accommodation; no exposure to unprotected
> heights or moving mechanical parts; limited to a moderate
> noise environment; able to perform simple, routine and
> repetitive tasks that are not performed at a fast production-rate
> pace, such as that found in assembly-line work; occasional
> interactions with co-workers and the public; able to tolerate
> occasional changes in a predictable work setting; and no
> forceful grasping and forceful torqueing [sic] with the left
> hand.

Tr. 21.

The ALJ concluded that Plaintiff is unable to perform his past relevant work as a
carpenter. Tr. 29.  However, based on Plaintiff's age, education, work experience, residual
functional capacity, and the testimony of the vocational expert, the ALJ found that Plaintiff
was capable of performing the requirements of representative occupations such as a
housekeeping cleaner, marker, and mail clerk.  Tr. 30.  Accordingly, the ALJ concluded
that Plaintiff was not under disability.  Tr. 30-31.

After receiving an unfavorable decision from the ALJ, Plaintiff requested review
from the Appeals Council, which was denied.  Tr. 1-7.  As part of his request for review,
Plaintiff submitted "new and material medical evidence regarding [Plaintiff's] treatment
from Twin Cities Spine Center."  Tr. 359; *see also* Tr. 364-92.

---

all of these activities. If someone can do light work, [the ALJ] determine[s] that
he or she can also do sedentary work, unless there are additional limiting factors
such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The Appeals Council determined that "this evidence does not show a reasonable probability that it would change the outcome of the [ALJ's] decision." Tr. 2. Accordingly, the Appeals Council "did not exhibit this evidence." Tr. 2.

## VII. ANALYSIS

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); *accord* 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a). Once the

claimant demonstrates that he cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

A claimant's "residual functional capacity is the most he can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. § 404.1546(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th

at 1360; *Norper*, 964 F.3d at 744-45.  As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 2022 WL 696974, at \*5 (quotation omitted).   Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted).  Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. § 404.1546(c).

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidence is not high." *Id.*  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (per curium) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks*, 687 F.3d at 1091.  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Plaintiff argues that the ALJ's decision should be reversed or remanded in light of the following alleged errors: (1) the Commissioner's failure to consider and exhibit the December 2020 Twin Cities Spine Center records; (2) the ALJ's finding that Plaintiff did not meet listing 1.04; (3) the ALJ's findings with respect to Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms; (4) the ALJ's finding that Dr. Burgarino's opinion was "generally persuasive"; and (5) the ALJ's findings regarding Plaintiff's inability to function. Pl.'s Mem. in Supp. at 15-23, ECF No. 19. The Court addresses each argument in turn.

### A. Post-Hearing Records

Plaintiff argues that the Commissioner erred by failing to consider and exhibit the December 2020 Twin Cities Spine Center records. Pl.'s Mem. in Supp. at 15-16. As stated above, Plaintiff submitted additional evidence to the Appeals Council as part of his request for review, namely, medical records relating to Defendant's December 2020 visit with Dr. Garvey at the Twin Cities Spine Center. *See* Tr. 364-92. The Appeals Council determined that "this evidence does not show a reasonable probability that it would change the outcome of the [ALJ's] decision," and therefore did not exhibit the evidence. Tr. 2.

Under the regulations, the Appeals Council must review additional evidence only where it is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change

the outcome of the decision." 20 C.F.R. § 404.970(a)(5). According to Plaintiff, there is a reasonable probability that the "rejected December 2020 Twin Cities Spine Center records" would change the outcome of the ALJ's decision because the

> records feature Dr. Garvey's expert physical examination of [Plaintiff] that resulted in the findings of 'mild increasing reflexes at the knees and ankles' as well as multiple beats of clonus bilaterally. These findings provide evidence of [Plaintiff's] radicular distribution of neurological signs under listing 1.15 and provide general objective support regarding the nature and extent of [Plaintiff's] lumbar spine symptoms and associated dysfunction.

Pl.'s Mem. in Supp. at 15-16 (citation omitted). Plaintiff argues that Dr. Garvey's findings "specifically contradict the ALJ's finding" that "radiographic examinations [did] not document compromise of a nerve root . . . or the spinal cord with evidence of nerve root compression characterized by a neuro-anatomic distribution of pain, limitation of the spine, motor loss (atrophy with associated muscle weakness . . . ) accompanied by sensory or reflex loss . . . ." *Id.* (citing Tr. 13-35). Plaintiff contends that had the ALJ considered the December 2020 evaluation, he would not have been able to make the findings he did. *Id.* at 16; Pl.'s Reply Mem. at 2, ECF No. 27.

When the Appeals Council denies review of an ALJ's decision after reviewing newly submitted evidence, the Court does not evaluate the Appeals Council's decision to deny review, but rather examines the record as a whole, including the additional evidence, to determine whether it supports the ALJ's decision. *See McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (citing *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)). Here, the Court finds that the additional Spine Center evidence does not create a reasonable

probability that the outcome would change if it is considered alongside the rest of the evidence before the ALJ.

Dr. Garvey's notes do not "contradict" the ALJ's finding that radiographic examinations did not document "compromise of a nerve root . . . or the spinal cord with evidence of nerve root compression characterized by . . . motor loss (atrophy with associated muscle weakness...) accompanied by sensory or reflex loss." *See* Pl.'s Mem. in Supp. at 15-16.   As explained further in the next section, listing 1.04(a) requires "[e]vidence of . . . motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Subpart P, Appendix 1, § 1.04.  While Dr. Garvey's notes stated that Plaintiff "had mild increasing reflexes at the knees and ankles versus the uppers" upon physical examination, they also stated that Plaintiff's "motor strength is grossly intact" and his "straight leg raise is negative bilaterally."  Tr. 368-69.  Thus, Dr. Garvey's notes provide little additional value for Plaintiff's disability claim.  In fact, Dr. Garvey's notes actually provide further support for the ALJ's finding that Plaintiff does not meet listing 1.04 because they set forth additional occurrences where Plaintiff did not demonstrate motor loss or positive straight leg raise testing.  Accordingly, the Court finds that the Appeals Council did not err in rejecting the Spine Center records because the evidence did not create a reasonable probability that the ALJ's outcome would have been different had the evidence been made part of the record.

### B. Findings Under Listing 1.04

Plaintiff also argues that the ALJ's finding that Plaintiff's spine impairments did not meet or equal listing 1.04 is unsupported by the evidence in the record. Pl.'s Mem. in Supp. at 17. The Commissioner responds that the ALJ found properly that Plaintiff's spine impairments did not meet listing 1.04. Comm'r's Mem. in Supp. at 5.

During step three of the disability determination, the ALJ considers whether the claimant's impairments meet or equal one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). "To meet a listing, a claimant must show that he . . . meets all of the criteria for the listed impairment." *Blackburn v. Colvin*, 461 F.3d 853, 858 (8th Cir. 2014) (citing *Zebley*, 493 U.S. at 531); *accord KKC ex. Rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) ("An impairment meets a listing only if it meets *all* of the specified medial criteria.") (quotation omitted). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing." *McCoy*, 648 F.3d at 611-12. Stated differently, "[a]n impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify." *Id*. at 612 (quotation and citation omitted). The claimant bears the burden of establishing that he meets all the criteria of the relevant listing. *Blackburn*, 761 F.3d at 858.

Listing 1.04 requires that a spinal disorder be accompanied by

    A. Evidence of nerve root compression characterized by neuro-
       anatomic distribution of pain, limitation of motion of the spine,
       motor loss (atrophy with associated muscle weakness or

38

muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position nor posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Subpart P, Appendix 1, § 1.04. Here, the ALJ specifically analyzed listing 1.04 and concluded that Plaintiff did not meet its requirements:

Listing 1.04 was considered, however, [Plaintiff's] radiographic examinations do not document compromise of a nerve root (including the cauda equina) or the spinal cord with evidence of nerve root compression characterized by a neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss or evidence of spinal arachnoiditis. Consequently, the requirements of Listing 1.04 are not met.

Tr. 19. Plaintiff contends that the ALJ's finding "is explicitly contradicted by the record" because Plaintiff's March 2020 cervical spine MRI showed a "[l]arge posterior disc protrusion with effacement of thecal sac and *flattening of the cord anteriorly*." Pl.'s Mem. in Supp. at 17 (citing Tr. 765-65).

While Plaintiff argues generally that his spine impairments meet listing 1.04, he does not state which specific subpart of the listing he meets. Plaintiff does not appear to argue, nor does the record indicate, that Plaintiff has a history of spinal arachnoiditis under

subpart B of listing 1.04. Nor does Plaintiff argue or the record indicate that Plaintiff has a history of lumbar spinal stenosis causing an inability to ambulate effectively under subpart C of listing 1.04. For example, Plaintiff was noted to ambulate without difficulty on numerous occasions. *See, e.g.,* Tr. 495, 553, 924. In fact, Plaintiff self-reported walking regularly, getting around 5,000 steps a day. *See, e.g.,* Tr. 961, 1059. Thus, it appears that Plaintiff argues that he meets subpart A of listing 1.04, which requires Plaintiff to show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising." *See* 20 C.F.R. Subpart P, Appendix 1, § 1.04A.

The requisite level of severity "is only met when all of the medical criteria listed . . . are simultaneously present." Social Security Acquiescence Ruling (AR) 15-1(4), *Radford v. Colvin: Standard for Meeting the Listing for Disorders of the Spine With Evidence of Nerve Root Compression*, 80 Fed. Reg. 57418-02, 57420 (Sept. 23, 2015) [hereinafter AR 15-1(4)][9]; *accord Atkins v. Colvin*, No. 15-1168-JWL, 2016 WL 2989393, at *12 (D. Kan. May 24, 2016). Thus, "when the listing criteria are scattered over time, wax and wane, or are present on one examination but absent on another, the individual's nerve root

---

[9] Listing 1.04 was eliminated when the Social Security Administration revised the listings regarding musculoskeletal disorders in 2021. The effective date of the revised listings was April 2, 2021, and the revised listings apply only "to new applications filed on or after the effective date . . . and to claims that are pending on or after the effective date." *Revised Medical Criteria for Evaluating Musculoskeletal Disorders*, 85 Fed. Reg. 78164 (Dec. 3, 2020). Because the ALJ's decision is dated December 28, 2020, this Court considers whether Plaintiff meets the criteria of listing 1.04A, which was in effect during the applicable period. The Court does not consider listing 1.15, which was not effective for applications filed before April 2, 2021.

compression w[ill] not rise to the level of severity required by listing 1.04A." AR 15-1(4) at 57420.

The Court agrees with the Commissioner that Plaintiff has not met his burden to demonstrate that he meets listing 1.04A simply because his March 2020 MRI showed "flattening of the cord anteriorly." *See* Comm'r's Mem. in Supp. at 6, ECF No. 26 (citing Pl.'s Mem. in Supp. at 17). Plaintiff fails to explain how these MRI findings rise to the level of severity required by listing 1.04A. Plaintiff does not detail specific evidence in the record showing that, contrary to the ALJ's decision, the record shows that he did meet all the criteria for listing 1.04A. For example, listing 1.04A requires demonstrated motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss. But the ALJ pointed to medical evidence showing that Plaintiff's muscle strength was intact. For example, the ALJ cited Dr. Staab's treatment notes from November 2018 where Dr. Staab noted that Plaintiff's "tone and bulk were normal, that his strength was 5/5 in his upper and lower extremities bilaterally, and that his sensation was intact to vibration," that his "reflexes were brisk, 2+ and symmetric in his upper and lower extremities, and that his gait and station was normal," and that he "had a full range of motion in all of his joints." Tr. 23. He also cited Dr. Burgarino's examination from April 2018 where he wrote that "the motor examination revealed no attenuation of [Plaintiff's] neuromuscular bulk, strength, or tone and that his motor strength was 5/5 in his upper and lower extremities bilaterally," and that Plaintiff's "reflexes were 2+ and symmetric bilaterally." Tr. 24. Similarly, the ALJ referenced Olga Ter-Grigoryan, APRN, CNP's treatment notes from July 2019, where she wrote that Plaintiff's "muscle strength was 5/5

and symmetric, his reflexes were full and symmetric, and that his sensation was normal to pinprick, light touch, and vibration." Tr. 25. Listing 1.04A further requires demonstrated positive straight-leg raising where there is involvement of the lower back. 20 C.F.R. Subpart P, Appendix 1, § 1.04A. Plaintiff fails to cite any medical records that demonstrate positive straight-leg raise testing. The Commissioner, however, cites to documented *negative* straight-leg raise testing. *See* Comm'r's Mem. in Supp. at 6; *see also* Tr. 711 ("Straight leg raising is normal to 90 degrees bilaterally."); Tr. 791 ("Straight leg raise is negative at 70 degrees on both sides."); Tr. 895 ("straight leg raises negative bilaterally"). Accordingly, the evidence supports the ALJ's finding that Plaintiff's impairment did not meet listing 1.04A. *See Twyford v. Comm'r of Soc. Sec.*, 929 F.3d 512, 517 (8th Cir. 2019) (substantial evidence supported determination that listing 1.04A was not met, as claimant did not have objective finding required by listing).

### C. Evaluation of Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ erred in the evaluation of the intensity, persistence, and limiting effects of his pain. Pl.'s Mem. in Supp. at 17-18. Plaintiff contends that the ALJ made two findings that are "manifestly contradicted by the record," specifically, that (1) Plaintiff's left wrist has "largely healed though it does limit his ability to engage in forceful grasping," and (2) Plaintiff's migraines are treated with over-the-counter medications. *Id.*

When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in*

*Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Admin. Mar. 16, 2016)

[hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017)

("Part of the [residual-functional-capacity] determination includes an assessment of the

claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of
> an individual's symptoms, [the ALJ] examine[s] the entire case
> record, including the objective medical evidence; an
> individual's statements about the intensity, persistence, and
> limiting effects of symptoms; statements and other information
> provided by medical sources and other persons; and any other
> relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  Such evaluation includes consideration of "(i) the

claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain;

(iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects

of medication; and (v) the claimant's functional restrictions."  *Vance v. Berryhill*, 860 F.3d

1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL

1119029, at *7.

 In considering the intensity, persistence, and limiting effects of a claimant's pain,

the ALJ is required to "consider whether an individual's statements about the intensity,

persistence, and limiting effects of his or her symptoms are consistent with the medical

signs and laboratory findings of record."  SSR 16-3p, 2017 WL 5180304, at *5; *see* 20

C.F.R. § 404.1529(a), (c)(2); *see also, e.g.*, *Grindley*, 9 F.4th at 630; *Halverson*, 600 F.3d

at 931.  "Credibility determinations are the province of the ALJ, and as long as good

reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will

defer to [the ALJ's] decision."  *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)

(quotation omitted); *see Grindley*, 9 F.4th at 630 ("We normally defer to an ALJ's credibility determination."); *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

Here, the ALJ concluded that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms "are inconsistent with the objective evidence in the record." Tr. 22. Among other inconsistencies, the ALJ found that "[t]he record documents that [Plaintiff's] left wrist has largely healed though it does limit his ability to engage in forceful grasping, as set forth in the residual functional capacity." Tr. 22. Plaintiff argues that the ALJ's finding is "simply incorrect" because "[a]s [Plaintiff] testified at [the] hearing and the record reflects elsewhere, he continues to have difficulty lifting and holding as a result of his ongoing left wrist problems." Pl.'s Mem. in Supp. at 17-18. The ALJ also concluded that Plaintiff "complains of migraine headaches, which he treats now with over-the-counter (OTC) medications. Botox was considered but apparently not covered by his worker's comp coverage. The course of treatment and treatment notes do not show his headaches to be debilitating . . . ." Tr. 22. Plaintiff argues that the ALJ "incorrectly dismissed" Plaintiff's migraine headache complaints because they are contradicted by the medical records and Plaintiff's hearing testimony showing that he has daily headaches that are not relieved with pain medication. Pl.'s Mem. in Supp. at 18.

The Court finds, however, that the ALJ did not err in finding that the claimed intensity, persistence, and limiting effects of Plaintiff's pain and symptoms were inconsistent with the medical records. To be sure, there is not really any dispute that

Plaintiff experiences pain. *See Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir.1999) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." (quotation omitted)).   The ALJ acknowledged Plaintiff's ongoing complaints of chronic pain and headaches when discussing the objective medical evidence, and noted places in the record where Plaintiff experienced diminished grip strength upon examination and reduced range of motion, among other symptoms.   Tr. 21-29.   At the same time, the ALJ observed correctly that the medical evidence shows that Plaintiff's "left wrist has largely healed though it does limit his ability to engage in forceful grasping."  Tr. 22.   The ALJ cited repeat examinations and imaging that showed generally unremarkable findings with respect to Plaintiff's wrist, and noted times where Plaintiff was documented to have improved wrist symptoms, including full range of motion and strength.  *See* Tr. 24-27.   The Court finds that the ALJ's conclusions are supported by substantial evidence in the record.   In fact, at an appointment with Dr. Kaiser in February 2019, Plaintiff reported "marked reduced pain in his left wrist."   Tr. 639-40.   The medical evidence after February 2019 makes little reference to subjective complaints or objective medical evidence demonstrating ongoing left wrist problems. Moreover, at the hearing, Plaintiff told the ALJ that he used to have wrist problems but those "seem[] to be okay."  Tr. 47.

Further, the effectiveness of medication and any other treatment other than medication a claimant uses to alleviate pain or other symptoms are relevant to the intensity, persistence, and limiting effects of a claimant's symptoms.   20 C.F.R. §§ 404.1529(c)(3)(iv), (v); SSR 16-3p, 2016 WL 1119029, at *7.   "If an impairment can

be controlled by treatment or medication, it cannot be considered disabling." *Hensley*, 829 F.3d at 933-34 (quotation omitted). Plaintiff's argument essentially appears to be that, despite undergoing a variety of different treatments, he continues to experience daily pain. But, again, there is not really any dispute that Plaintiff experiences pain. *See Hutton*, 175 F.3d at 654; *see also Nicole W. v. Kijakazi*, No. 20-cv-2697 (SRN/BRT), 2022 WL 3047088, at *5 (D. Minn. July 14, 2022) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain, but complaints of pain alone are not determinative of whether there should be a finding of disability."), *report and recommendation adopted*, 2022 WL 3045130 (D. Minn. Aug. 2, 2022). Nor did the ALJ conclude that over-the-counter medications entirely eliminated Plaintiff's pain caused by migraine headaches. Without intending to be insensitive to the existence of Plaintiff's pain, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (quotation omitted). It was not a contradiction of the record for the ALJ to note—correctly—that the medical records showed that Plaintiff reported medication, physical therapy, and other remedies were helpful and improved his pain. Tr. 23-26; *see also, e.g.,* Tr. 514 (reporting that while wrist pain was originally one of Plaintiff's main symptoms following the explosion, hip pain has become more of an issue as his other symptoms subsided); Tr. 698 (reporting that his symptoms have been "much better" since taking amitriptyline). The ALJ properly considered the effectiveness of these treatments in evaluating whether Plaintiff's pain was as limiting as he alleged.

Moreover, the ALJ also properly considered Plaintiff's daily activities in his analysis. A claimant's daily activities is evidence outside of the objective medical evidence that an ALJ may consider as a factor when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *7; *see also, e.g.*, *Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022) ("While daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain."). "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Halverson*, 600 F.3d at 932 (quotation omitted); *see also, e.g.*, *Swarthout*, 35 F.4th at 612 ("The ALJ reasonably concluded that other daily activities—caring for personal hygiene, managing medications, preparing simple meals, stretching and performing gentle exercises, watching television, reading the newspaper, going for short walks outside, riding a bike, driving, handling money, doing some laundry, and doing some household chores in short increments—provide evidence that [the claimant] is not as limited as she has alleged." (quotation omitted)); *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) ("[The claimant] himself admits to engaging in daily activities that this court has previously found inconsistent with disabling pain, such as driving, shopping, bathing, and cooking."); *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) ("[The claimant's] activity level undermines her assertion of total disability. Indeed, [the claimant] admitted that she, among other things, performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family.");

*Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) ("[The claimant] engaged in extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends.").

Here, the ALJ found that Plaintiff's daily activities were "inconsistent with a finding of total disability." Tr. 29. The ALJ noted that Plaintiff

> [g]rooms and bathes himself, helps get the children ready for school and daycare, does housework, cooks, goes shopping, takes care of the pets, does the laundry, mows the lawn with a riding mower, goes for walks, drives a car, pays bills and handles money, does some hunting, goes fishing, four wheeling, and kayaking, attends appointments, and goes to his son's basketball games and practices. . . . [H]e spent time taking care of his children. He stated that he drove the 2 year old to day care, that he spent time working on household tasks, that he cleaned the house, did dishes, cooked and did laundry. He stated that other family members usually did the outside work, but that he could do it if necessary. [His] wife noted . . . that [he] is able to perform the same activities as [he] had reported.

Tr. 29. "[I]t is well-settled law that 'a claimant need not prove []he is bedridden or completely helpless to be found disabled." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). Yet, a claimant's daily activities are *a factor* to be considered in evaluating allegations of disabling pain, *Swarthout*, 35 F.4th at 612, and the Eighth Circuit Court of Appeals has repeatedly held that the types of activities Plaintiff engages in are inconsistent with an allegation of total disability. *See, e.g., Swarthout*, 35 F.4th at 612; *Bryant*, 861 F.3d at 782; *Wright*, 789 F.3d at 854; *Ponder*, 770 F.3d at 1195; *Halverson*, 600 F.3d at 932. Thus, it was proper for the

ALJ to consider Plaintiff's activities as one factor in concluding that his pain was not as limiting as alleged.

In sum, the ALJ properly considered the evidence in concluding that the claimed intensity, persistence, and limiting effects of Plaintiff's pain and symptoms were inconsistent with the evidence in the record.

### D. Persuasiveness of Dr. Burgarino's Opinion

Plaintiff next argues that the ALJ erred in his analysis of Dr. Burgarino's opinions because he failed to analyze them properly under the factors set forth in 20 C.F.R. § 404.1520c. Pl.'s Mem. in Supp. at 18-20. Had the ALJ done so, Plaintiff contends that the ALJ would have found that Dr. Burgarino's opinions "are not persuasive to any degree." *Id*. at 19.

When determining the residual functional capacity, an ALJ must consider all medical opinions and prior administrative findings submitted and evaluate them for persuasiveness. 20 C.F.R. § 404.1545(a)(1). Under the regulations, the ALJ does not defer or give any specific weight to any medical opinions, including opinions from the claimant's treating medical sources. 20 C.F.R. § 404.1520c(a). The ALJ instead considers all medical opinions according to five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or administrative finding. 20 C.F.R. § 404.1520c(c). Supportability[10] and

---

[10] The regulations define the factor of "supportability" as follows:

The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical

consistency[11] are the most important factors, and the ALJ must explain how those two factors were considered in determining the persuasiveness of a medical opinion.  20 C.F.R. § 404.1520c(b)(2).  The ALJ is not required to explain the remaining factors unless the ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well supported . . . and consistent with the record . . . but are not exactly the same."  20 C.F.R. § 404.1520c(b)(2)-(3).

Dr. Burgarino submitted an opinion on Plaintiff's limitations, discussed *supra* in Section IV.  The ALJ spent almost a page of his analysis summarizing Dr. Burgarino's opinions:

> [T]here was no compelling contemporaneous evidence to support the sustenance of any closed head traumatic brain concussive injury related to the work accident of April 26, 2018. . . . [X]-rays of [Plaintiff's] right wrist and hand were unremarkable . . . .   [X]-rays of [Plaintiff's] hips were unremarkable. . . . [Plaintiff's] station, gait and posture were normal, and that his heel, toe and tandem walking were performed without difficulty. * * * [Plaintiff] was fully oriented and that his attention, concentration, short, intermediate and long-term memory functions, calculation, abstraction, judgment, and insight were present and normal.
> * * * He stated that light duty work restrictions were medically appropriate for the 3 months following the examination and [] permanent work restrictions, if any, would be determined at that time.  He stated that light duty work was supported, though

---

finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1).

[11] The regulations define the factor of "consistency" as follows:

The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(2).

>this opinion was not intended to be permanent, but rather
>subject to further review time (Exhibit 6F). . . .

Tr. 24.  The ALJ found Dr. Burgarino's opinions "generally persuasive," noting the "[t]he performance of light duty work is supported by the objective evidence in the record, however, this opinion was not intended to be permanent, but rather subject to further review."  Tr. 24-25.

Plaintiff argues that the ALJ erred by failing to consider Dr. Burgarino's "relationship" with Plaintiff.  Pl.'s Mem. in Supp. at 19.  Plaintiff contends that Dr. Burgarino performed an adverse medical examination as he was hired by the workers' compensation insurer to bolster the insurer's denials of Plaintiff's requests for wage loss and medical benefits.  *Id*.  Further, Plaintiff contends that Dr. Burgarino only examined Plaintiff once, very briefly, seven months after his injuries, and over two years prior to the hearing before the ALJ.  *Id*.  Plaintiff also argues that Dr. Burgarino's status as a neurologist does not render him qualified to give opinions about Plaintiff's physical limitations, and his work restrictions should have been limited to the conditions within his area of expertise.  *Id*. at 19.  As discussed above, however, the ALJ was not required to explain factors other than supportability and consistency.  20 C.F.R. § 404.1520c(b)(2) ("[W]e will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) . . . .").  Thus, the ALJ did not err by failing to explain how he considered the third factor, Dr. Burgarino's relationship with Plaintiff, including the length of the

treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship. Nor did the ALJ err by failing to explain how he considered the fourth factor, Dr. Burgarino's specialization. While the ALJ could have explained how he examined Dr. Burgarino's relationship with Plaintiff and Dr. Burgarino's education and training with respect to the relevant area of specialty of his opinions, he was not required to do so. *Id*.; *see also* 20 C.F.R. § 404.1520c(c)(4).

Having reviewed the entire record in this case, the Court concludes that Dr. Burgarino's opinions are supported by substantial evidence in the record, and the ALJ did not err in failing to explain how he considered Dr. Burgarino's relationship with Plaintiff and Dr. Burgarino's education and training on the subjects Dr. Burgarino opined on.

### E. Plaintiff's Ability to Function

Lastly, Plaintiff argues that the ALJ's "findings regarding [his] ability to function are unsupported by substantial evidence in the record." Pl.'s Mem. in Supp. at 20. In other words, Plaintiff contends that the ALJ's residual functional capacity is not supported by substantial evidence. He makes several arguments:

1.     The ALJ erred by relying on medical records from an April 22, 2022, medical appointment because the visit was done by telephone and therefore no physical examination was conducted. *Id*. at 20.

2.     The ALJ erred by giving greater weight to doctors' findings that Plaintiff was "pleasant and cooperative" than to evidence that Plaintiff's marriage was deteriorating and he lost social supports. *Id*.

3.     The ALJ erred by disregarding a "chart note in conjunction with [a] one-page Report of Work Ability," which provided support for Dr. Butcher's work restrictions. *Id*. at 21.

4.     The ALJ erred by giving "greater weight to brief references in physical therapy notes over the opinions of specialist physicians who performed thorough physical examinations." *Id*. at 21-22.

5.     The ALJ erred by failing to assign any weight to Lynne Lamar's opinions because (1) the ALJ was inconsistent in discussing the treatment relationship between Lamar and Plaintiff when he did not do so for Dr. Burgarino's or Melissa Rose's opinions, and (2) her opinions contradict the ALJ's finding that Plaintiff was "able to maintain a fair amount of activity, particularly with parenting his child." *Id*. at 22.

6.     The ALJ erred by failing to rely on Iwu's opinions because Iwu's opinions were consistent with the objective medical evidence. *Id*. at 22-23.

With each of his arguments, Plaintiff is essentially asking this Court to reweigh the objective medical evidence, which this Court may not do. *See Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014); *see also Dols v. Saul*, 931 F.3d 741, 746 (8th Cir. 2019) ("It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." (quotation omitted)).  It is not surprising that Plaintiff is able to point to some evidence in a record that supports a different conclusion than the one reached by the ALJ in this case. *See, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("[I]t is not surprising that, in an administrative record which exceeds 1,500 pages, [the claimant] can point to some evidence which detracts from the Commissioner's

determination."). But, "[r]eversal is not warranted, however, merely because substantial evidence would have supported an opposite conclusion." *Grindley*, 9 F.4th at 627 (quotation omitted); *see Perks*, 687 F.3d at 1091; *Boettcher*, 652 F.3d at 863. In fact, as stated above, "[i]f after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676. Here, there is substantial evidence in the record as a whole to support the ALJ's residual functional capacity, and the ALJ's decision is therefore affirmed.

## VIII. ORDER

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 18, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 25, is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: March ___22___, 2023          _____*s/ Tony N. Leung*_____
                                    Tony N. Leung
                                    United States Magistrate Judge
                                    District of Minnesota

                                    *Robert J. F. v. Kijakazi*
                                    Case No. 21-cv-2054 (TNL)